Casey, C. J.,
delivered the opinion of the Court.
On the 27th day of June, 1859, the Quartermaster General of the United States, by an advertisement, invited proposals to be received until the 1st October, 1855, for the transportation of military supplies during the years 1860 and 1861, on the following routes :
“1. From Forts Leavenworth and Riley, in the Territory of Kansas, from Fort Laramie, in the Territory of Nebraska, or from any point *91 on the west bank of the Missouri river, north of Fort Leavenworth and south of latitude 42° north, at which a depot may be established, to the posts which are now or may be established in the Territory of Nebraska south of latitude 44° north, in Oregon south of latitude 44° north and east of longitude 114° west, and in the Territory of Utah north of latitude 40° north and east of longitude 114° west.
“2. From Forts Leavenworth and Riley, in the Territory of Kansas, and from the town of Kansas, in the State of Missouri, to Fort Union, in the Territory' of New Mexico, or to any other depot that may be designated in that Territory.
“ 3. From Fort Union, or such other depot as may be designated in the Territory of New Mexico, to the posts or depots that are or may be established in the department of New Mexico, except Forts Bliss and Fillmore.
“ The weight to be transported each year will not be less on either of the routes than one hundred thousand pounds, nor more on route 1 than ten millions of pounds, and on routes 2 and 3 than two million, five hundred thousand pounds each.
“Proposals will state the rate per hundred pounds per hundred miles for which the transportation will be performed on each route in each month of the year, and may be made for all the routes collectively, for any two of them, or for each route separately.”
In pursuance of this public invitation the claimants presented a proposal for the transportation on routes 2 and 3 above designated.
The bids received were opened on the first of October, 1859, but for some cause not explained in this record, no award of the service on routes 2 and 3 was made until the 12th November, 1859, when the claimants were declared the lowest bidders, and the contracts awarded to them. The claimants resided in the Territory of New Mexico— Mr. Boice at Las Vegas, and Mr. Moore at Tecolote, in that Territory. On the same day, 12th November, 1859, Major Sibley, of the Quartermaster General’s department, at Washington, wrote to Mr. Boice, one of the claimants, informing him of the award to Mr. Moore and himself of the transportation on these routes, and that the contracts and bonds to be executed by them had been forwarded to Major J. L. Donaldson, assistant quartermaster at Santa F6, for execution by them. -Owing to the interruption of the mails on the plains by the hostility of some Indian tribes, the papers thus sent were delayed in reaching Major Donaldson. When received by him, he notified the parties, both of whom resided some distance from Santa Fe, and the sureties also, *92 wliom they had proposed, resided in different portions of the Territory of.New Mexico, except Robert Campbell, who lived at the city of St. Louis. The contracts were executed and the bonds signed by the sureties resident in New Mexico, and returned to Major Donaldson about the 11th day of January, 1860, and on that day the contracts were forwarded by him to the Quartermaster General, at Washington, and the bonds were sent to Mr. Campbell, at St. Louis, to be signed by him, as one of the sureties, and then forwarded to Washington, which was done. According to the usual practice in such cases, the proposal of Moore & Boiee was to transport such supplies as the government desired to transmit over the designated routes, at a stipulated rate per hundred pounds per hundred miles, varying in the different months and seasons of the year. The body of the contracts did not contain these various rates for the different months of the year, but they were contained in tabular schedules attached to the contracts. In one of the contracts this statement was referred to as follows: “And for the faithful performance of such service they shall be paid in the maner hereinafter provided for in article sixth of this agreement, and at the rates specified and shown in the tabular statement hereto annexed, and signed by the parties to this agreement, which statement is considered as part hereof.” And in section 6th of the contract it is again referred to as follows :
“ It is further understood that payments are to be made for the actual distance travelled from the place of departure to that of delivery, the distance being indorsed on the bill of lading by the officer receiving the supplies, at the rates per hundred pounds per hundred miles specified in the tabular statement hereto annexed, and signed by both the parties to this agreement.” There were similar references to the tabular statement in the other contract. These contracts and the tabular statements annexed to them were signed on behalf of the United States, by Major E. S. Sibley, quartermaster, at Washington, before they were forwarded to New Mexico. The claimants, in executing the contracts, omitted, from some cause or other, to sign the tabular statements. This omission was discovered after the contracts were forwarded, and on the 23d of February, 1860, Robert Campbell, of St. Louis, a gentleman of large wealth, as appears from the evidence, filed in the office of the Quartermaster General a written guarantee that the claimants would sign the schedules and supply the omission. The evidence does not show what day in February, 1860, the contracts and bonds reached the office of the Quartermaster General at Wash *93 ington, but it must have been between tbo 10th and 23d of .that month.
On the 10th February, I860, the contracts not having been returned, the Secretary of War directed a new advertisement for other proposals to be received for the same transportation until the 11th day of April, 1860. When the contracts and bonds of claimants were filed, General Jesup, the Quartermaster General, notified the Secretary of War of the fact, who transmitted the following decision and order in the premises:
War Department, February 28, 1860.
Upon mature reflection, I think it best to receive such bids as may be offered under the advertisement inviting them. It will throw open a wide door to competition, and is likely to result in a lower rate of transportation. As Moore & Boyce have not complied with the terms of the original advertisement, which required the contracts and transportation to be ready by the first of January, and, moreover, as the contracts are not yet legally executed, but rest upon an “ understanding” that they are to bo at some future day, I think it safest not to reverse the action already taken by the department.
J. B. FLOYD,

Secretary of War.

Under the call for new bids the transportation was awarded to B,ussel, Majors & Waddell, who had the contracts for several years before. The rates were much higher than those at which Moore & Boiee were to perform the service.
The Secretary of War having refused to recognize the contracts of. the claimants as valid, completed, and subsisting agreements, they brought this suit to recover the damages they have sustained by reason of the refusal of the Secretary of War to allow them to perform the service and receive the compensation under their contracts. These damages they allege are the profits which they would have realized if they had been permitted to perform the service stipulated, or, in other words, the difference between the cost of performing it to them, and the amount they were to receive for it under the contracts.
Many witnesses were examined on this subject, and while they freely and confidently give their opinions as to the profits that might have been made, the elements upon which their calculations are based are meagre and very uncertain. Ceran St. Vrain says, in answer to an *94 interrogatory requiring him (after looking at the schedule of rates) to state what would be the net profit on transporting supplies to and in New Mexico at the prices therein named: about two hundred and fifty dollars per wagon, averaging the risk and expenses during the entire year on the contract from Fort Leavenworth to Fort Union. He says that the usual time for an ox-team is fifty days, and with a mule-team forty days. He gives the actual expenses for a single trip in summer time, and makes it, including interest .and wear and tear, two hundred and one dollars. A team could take 5,500 pounds in summer, which, at seven cents per pound, would amount to three hundred and eighty-five dollars; and which would leave a net profit of one hundred and eighty-four dollars. He also testifies that in winter time the teams could not carry so much freight, in consequence of having to carry feed for the cattle, and that the expenses would be largely increased.
James L. Johnston, George H. Estes, and Levi Spiegelberg, severally testify that the cost of transporting freight from Leavenworth to Fort Union is from four to five cents per pound. Jacob Amberg is of opinion that the cost in summer months would not exceed two and a half or three cents per pound.
William Ivers and Joseph Hersch are of opinion that by the schedule prices from Fort Union to other points in the Territory the profits would be equal to one-half of the- gross amount to be paid. The proof is that the lowest price of freights paid by private individuals was from eight to eleven cents per pound; and that freighters were readily engaged at from eight to ten cents per pound. Some of the witnesses engaged largely in merchandising paid these prices in preference to doing their own transportation as they had formerly done. The proof is that the transportation was mostly done during the summer months, commencing with May and ending with September or October; the large amount being in May, June, and July. The prices, it is admitted, would have averaged about seven dollars per hundred pounds from Fort Leavenworth to Fort Union, the distance being seven hundred miles. The claimants, therefore, contend that they are entitled to damages to the amount of two dollars per hundred pounds for the amount of freight the government transported over such route during the period these contracts were to run, as being the profit they would have made, under the evidence, if they had been permitted to fulfil the same; and that they are likewise entitled, under the evi *95 dence, given by William Ivers and Joseph Hersch, to one-half the freight earned on the route within the Territory as their profit.
In making their estimates of profits none of the witnesses appear to have made any allowance for the risk or destruction of trains, nor for the keeping and care of the trains and cattle during a largo portion of the year when they were not occupied, nor for the expense of superintendence and agencies, at the points of departure and arrival, and intermediate stations, nor for the personal time and expenses of the claimants in directing and managing the business, while we conceive these are all matters which should properly enter into the calculations.
The questions arising upon this statement of facts are not entirely free from perplexity; and while there has been considerable difficulty in some of the aspects the case presents, a majority of the court coincide in the following conclusions :
1st. That there was a complete contract between the claimants and the United States in relation to the transportation on the routes named, in February, 1860.
2d. That such contracts were repudiated or rescinded by the Secretary of War, ácting on behalf of the United States, after the claimants had incurred considerable expense in preparing to perform such contracts, without any lawful cause or excuse, and in violation of the rights of the claimants.
3d. That the measure of damages for such violation is the clear net profits the claimants would have realized if they had been permitted to perform the contract, or the difference between what it would have cost them to perform the service and the amount they were to receive for it.
4th. That in deciding what would have been the profits derived from the contract, the court is not bound by the opinions or estimates of witnesses, but are to make the assessment of damages from the facts and elements furnished by the evidence, making due allowances for the usual risks, contingencies, insurance, interest, and depreciation of stock and material incident to such operations, and also expense of superintendence and agencies, the value of personal time and expenses, the keep and care of the stock and material for the time they would have been unemployed, as well as the immediate and direct cost to the claimants of transporting the goods, or performing the required service.
5th. Estimating the damages upon this basis, and making proper *96 allowance for the matters specified above, we find the claimants entitled to recover the sum of $24,559 06.
Mr. J. S. Watts for the claimants.
Mr. J. D. McPherson, Assistant Solicitor, for the government.
Loring and Hughes, J. J., dissent.